# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

### JACKSONVILLE DIVISION

### CASE NO. 3:17-CV-00348-HES/MCR

**BENJAMIN MICHAEL DUBAY,**

     **Plaintiff,**

**vs.**

**STEPHEN KING; MEDIA RIGHTS
CAPITAL; IMAGINE
ENTERTAINMENT; SONY
PICTURES ENTERTAINMENT;
MARVEL ENTERTAINMENT;
SIMON & SCHUSTER,**

     **Defendants.**

_____

**DEFENDANTS' DISPOSITIVE MOTION FOR SUMMARY JUDGMENT
AND MEMORANDUM OF LAW IN SUPPORT**

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ....................................................................................1

II.   THREE TYPES OF DEFENDANTS' WORKS ARE AT ISSUE: PROSE
      NOVELS, GRAPHIC NOVELS, AND A THEATRICAL FILM ...................4

III.  SUMMARY JUDGMENT STANDARD ...................................................4

IV.   THE ELEMENTS OF A COPYRIGHT INFRINGEMENT CLAIM ...............5

V.    THE COPYRIGHT SUED UPON ...........................................................8

VI.   PLAINTIFF'S CLAIMS ARE SO BROAD THAT RELIANCE UPON
      SUMMARIES IS PERMISSIBLE..............................................................8

VII.  THE CREATION AND 1977 PUBLICATION OF THE ROOK ..................10

VIII. THE *DARK TOWER* PROSE NOVEL WORKS ARE NOT INFRINGING ..................11

      A.   Roland's Creation Before 1977 and King's Continuing Creative Role................11

      B.   Roland Deschain in the Prose Novels is Not Substantially Similar to
           Protected Expression in the Restin Dane Character ....................14

           1.   The Restin Dane (Rook) Character ....................................18

           2.   King's Roland Deschain Character....................................20

      C.   Stephen King and the Allegedly Infringing Prose Novel Visual Artists Did
           Not Have Access to the Copyrighted Work........................23

IX.   *THE DARK TOWER* GRAPHIC NOVEL WORKS ARE NOT INFRINGING ..................25

      A.   Roland Deschain in the Graphic Novels is Not Substantially Similar to
           Protected Expression in Restin Dane ....................................26

      B.   There is No Evidence of Access to The Rook by the Graphic Novel Artists........28

X.    *THE DARK TOWER* 2017 THEATRICAL FILM IS NOT INFRINGING ..................28

      A.   Roland Deschain in the Theatrical Film is Not Substantially Similar to
           Protected Expression in Restin Dane ....................................29

      B.   There is No Evidence of Access to The Rook by the People Who Created
           the Character of Roland in the Film........................................31

XI.   THE GRAPHIC NOVEL AND PROSE NOVEL IMAGE DISSIMILARITIES
      ARE SUCH THAT PLAINTIFF'S CLAIMS OF IMAGE INFRINGEMENT
      WOULD BE SPECIOUS EVEN IF ACCESS WERE SHOWN ...................31

XII.  PLAINTIFF'S EXPERTS DO NOT CREATE ISSUES OF MATERIAL FACT...........32

      A.   Plaintiff's Buchanan Offers Inadmissible Lay Opinion....................32

      B.   Plaintiff's Typewriter Expert Pridgen Offers No Relevant Testimony ...............35

      C.   Plaintiff's Similarity Expert Arndt Has Highlighted The Absence of Any
           Relevant Similarity Between Plaintiff's and Defendants' Works ....................36

CONCLUSION....................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Aaron Basha Corp. v. Felix B. Vollman, Inc.*, 88 F.Supp.2d 226 (S.D.N.Y. 2000) ..................... 35

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ..................... 5

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) .............. 5

*Arden v. Columbia Pictures Indus., Inc.*, 908 F.Supp. 1248 (S.D.N.Y. 1995) ............................ 17

*Armour v. Knowles,* 512 F.3d 147 (5th Cir. 2007) .......................................................... 24

*Asplundh Mfg. Div. v. Benton Harbor & Engineering*, 57 F.3d 1190 (3rd Cir. 1995) ................. 33

*Beal v. Paramount Pictures Corp.*, 20 F.3d 454 (11th Cir.1994) ..................................... 5, 6, 7, 17

*Benay v. Warner Bros Entertainment, Inc.*, 607 F.3d 620 (9th Cir. 2010) .................................. 16

*Benson v. Coca-Cola Co.*, 795 F.2d 973 (11th Cir. 1986) *(en banc)* ............................................ 24

*Bissoon-Dath v. Sony Computer Entm't Am., Inc.*, 694 F.Supp.2d 1071 (N.D. Cal. 2010) ......... 16

*BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 489 F.3d 1129 (11th Cir. 2007) .............................. 14

*Cabell v. Sony Pictures Entm't, Inc.*, 714 F.Supp.2d 452 (S.D.N.Y. 2010) .......................... 17, 32

*Calhoun v. Lillenas Publ'g*, 298 F.3d 1228 (11th Cir. 2002) ........................................................ 6

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ..................... 4, 5

*Certain Underwriters at Lloyds, London v. Sinkovich*, 232 F.3d 200 (4th Cir. 2000) .................. 34

*Coquico, Inc. v. Rodriguez-Miranda*, 562 F.3d 62 (1st Cir. 2009) ................................................ 16

*Dath v. Sony Computer Entm't Am., Inc.*, 653 F.3d 898 (9th Cir. 2011) ...................................... 16

*Dellar v. Samuel Goldwyn, Inc.*, 150 F.2d 612 (2d Cir. 1945) ...................................................... 1

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 111 S.Ct. 1282, 113
    L.Ed.2d 358 (1991) ........................................................................................... 6, 7, 23

*Feldman v. Twentieth Century Fox Film Corp.*, 723 F.Supp.2d 357 (D. Mass. 2010) ................ 16

*Fisher v. United Feature Syndicate, Inc.*, 37 F.Supp.2d 1213 (D. Col. 1999) ............................. 37

i

*Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348 (6th Cir. 2004) ..............................24

*Franklin Mint Corp. v. National Wildlife Art Exchange*, 575 F.2d 62 (3rd Cir. 1978) .................31

*Gentieu v. John Muller & Co.*, 712 F.Supp. 740 (W.D. Mo. 1989) ........................................31

*Harper & Row Publishers v. Nation Enter.*, 471 U.S. 539, 85 L.Ed.2d 588, 105 S.Ct. 2218 (1985) ......................................................................................................................7

*Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197 (9th Cir. 1989) .................................7

*Herzog v. Castle Rock Entertainment,* 193 F.3d 1241 (11th Cir. 1999) ....................5, 6, 7, 16, 24

*Hester v. BIC Corp.*, 225 F.3d 178 (2d Cir. 2000) ..............................................................33, 34

*Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir.2004) .............................4

*Hirst v. Inverness Hotel Corp.*, 544 F.3d 221 (3rd Cir. 2008) ..............................................34

*Hogan v. DC Comics*, 48 F.Supp.2d 298 (S.D.N.Y. 1999) ..................................................17

*Infodek, Inc. v. Meredith-Webb Printing Co.*, 840 F.Supp. 614 (N.D. Ga. 1993) .......................37

*Jackson v. BellSouth Telecomms.*, 372 F.3d 1250 (11th Cir.2004) ..........................................5

*Jason v. Fonda*, 698 F.2d 966 (9th Cir. 1982) ....................................................................6

*Litchfield v. Spielberg*, 736 F.2d 1352 (9th Cir. 1984) ........................................................30

*Metro Goldwyn Mayer, Inc. v. American Honda Motor Corp.*, 900 F.Supp. 1287 (C.D. Cal 1995) ........................................................................................................................15

*Metro Goldwyn Mayer, Inc. v. Showcase Atlanta Co-op Productions, Inc.*, 479 F.Supp. 351 (N.D. Ga. 1979) ............................................................................................................16

*National Hispanic Circus, Inc. v. Rex Trucking, Inc.*, 414 F.3d 546 (5th Cir. 2005) ..................33

*Nichols v. Universal Pictures Corp.*, 45 F.2d 119 (2d Cir. 1930) ............................................15

*Peter Letterese & Associates, Inc. v. World Institute*, 533 F.3d 1287 (11th Cir. 2008) ............6, 17

*Peters v. West*, 776 F.Supp.2d 742 (N.D. Ill. 2011) ............................................................37

*Rentmeester v. Nike, Inc.*, 883 F.3d 1111 (9th Cir. 2018) ....................................................7

*Rice v. Fox Broadcasting Co.*, 330 F.3d 1170 (9th Cir. 2003) ..................................7, 8, 16, 17

*Rogers v. Koons*, 960 F.2d 301 (2d Cir. 1992) ..................................................................31

42232.docx

*Selle v. Gibb*, 741 F.2d 896 (7th Cir. 1984) .................................................................37

*Sheldon Abend Revocable Trust v. Spielberg*, 748 F.Supp.2d 200 (S.D. N.Y. 2010) ..................16

*Sheldon Abend Revocable Trust v. Spielberg*, 786 F.Supp.2d 200 (S.D.N.Y. 2010) ...................38

*Smith v Weinstein*, 578 F.Supp. 1297 (S.D.N.Y. 1984) *aff'd per curiam* 738 F.2d 419 (2d Cir. 1984) .................................................................................................................21

*Steele v. Turner Broadcasting System, Inc*., 646 F. Supp. 2d 185 (D. Mass. 2009) .....................35

*SunTrust Bank v. Houghton Mifflin Co*., 286 F.3d 1257 (11th Cir. 2001) ....................................17

*Toho Co. Ltd. v. William Morrow & Co., Inc*., 33 F.Supp.2d 1206 (C.D. Cal. 1998) ..................15

*Torres v. County of Oakland*, 758 F.2d 147 (6th Cir. 1985) ...........................................................33

*Warner Bros., Inc. v. Am. Broadcasting Cos*., 720 F.2d 231 (2d Cir.1983) .................5, 21, 34, 35

*Whitehead v. Paramount Pictures Corp*., 53 F.Supp.2d 38 (D.D.C. 1999) ....................................16

*Wildlife Exp. Corp. v. Carol Wright Sales, Inc*., 18 F.3d 502 (7th Cir. 1994) ..............................31

*Williams v. Crichton*, 84 F.3d 581 (2d Cir. 1996) ...........................................................................38

**FEDERAL STATUTES**

17 U.S.C. §101 .................................................................................................................................17

17 U.S.C. §102(b) ..............................................................................................................................6

17 U.S.C. §106(2) .............................................................................................................................29

**FEDERAL REGULATIONS**

37 CFR §202.1(a).............................................................................................................................37

**TREATISES**

1 M.&D. Nimmer, *Nimmer on Copyright*, §2.27 at 2-163 (2018) .................................................15

4 M.&D. Nimmer, *Nimmer On Copyright*
§8.09[A][1] ...................................................................................................................29
§ 13.01 at 13-6 ...........................................................................................................6, 7

42232.docx

Defendants Stephen King ("King"), MRC II Distribution Company L.P. ("MRC") (erroneously sued herein as "Media Rights Capital"), Imagine Entertainment ("Imagine"), Marvel Entertainment ("Marvel"), Simon & Schuster, Inc. ("S&S"), and Sony Pictures Entertainment ("SPE"), pursuant to Rule 56, Fed.R.Civ.P. and L.R. 3.01, hereby move for summary judgment on all claims of Plaintiff, Benjamin Michael DuBay ("B. DuBay").

## I.      INTRODUCTION

This is a copyright action, and like many others before it, it is premised "partly upon a wholly erroneous understanding of the extent of copyright protection; and partly upon that obsessive conviction . . . that all similarities between [Plaintiff's] works and any others which appear later must inevitably be ascribed to plagiarism." *Dellar v. Samuel Goldwyn, Inc.*, 150 F.2d 612 (2d Cir. 1945). Plaintiff alleges that the comic magazine character The Rook, aka Restin Dane, standing alone (or *per se*) is protected by copyright, that he owns the copyright, and that the copyright is infringed by eight *Dark Tower* novels written by Stephen King, comprising more than 4,200 pages, 16 of Marvel's licensed *The Dark Tower* graphic novels, and a 2017 feature film, *The Dark Tower*. Plaintiff alleges that the character Roland Deschain, as featured in all of Defendants' works, is so similar to Restin Dane, aka The Rook, that all of the Defendants' works have copied his protectible expression. He makes this claim despite the fact that none of the people who created The Rook ever noticed any sort of meaningful similarity between the works after King's prose novel works became available to the public. The simplest and most direct answer to Plaintiff's claims is that the characters of Roland and The Rook are so utterly different that no copyright claim can be sustained.

From 1970 to 2012, Stephen King wrote eight novels and a novella that, together, comprise his multi-genre series *The Dark Tower*. The series has as its central character Roland, a questing, knightly individual from a caste known as gunslingers. Roland lives in a parallel world called Mid-World that has elements of feudal society, elements of the American old west, remnants of a prior technologically advanced society, and elements of magic that can be traced back to the court of Roland's ancestor, Arthur Eld, Mid-World's equivalent of King Arthur.

1

Roland's quest, as it evolves, is to find and save the Dark Tower, the structure at the nexus of all universes that is under attack from the dark forces of Roland's ultimate antagonist, the Crimson King.

Plaintiff alleges that the character of Roland improperly copies a 1977 comic book character called Restin Dane, aka The Rook, initially published in issue 82 of a comic magazine entitled *Eerie*. Plaintiff alleges that King had access to The Rook after it was published in 1977, and improperly copied The Rook by incorporating substantial amounts of protectible expression embodied in The Rook. Plaintiff cannot identify any sentences or text in any of the Defendants' works that are similar to text contained in The Rook, nor has Plaintiff identified any visual material in The Dark Tower works that is similar to The Rook in any sense other than broad subject matter. Defendants deny (1) that King ever had access to The Rook; (2) that any part of The Dark Tower was in any way a copy of The Rook; and (3) that Roland, as portrayed in the prose novels, the Marvel Comics, and the theatrical film, has any substantial similarity of protected expression to The Rook. The only similarities that exist are at the level of abstract, unprotectible ideas.

As a literary character, Defendants' Roland has a long character arc and a troubled inner life filled with dimensions of human experience utterly foreign to, and incompatible with, Plaintiff's Rook. Unlike Plaintiff's Rook, Roland ages from adolescence to an arthritic old age. Roland is tortured by self-questioning and remorse, makes many tactical and moral mistakes, and at his low ebb commits violent acts that verge on war crimes. Roland's desperate quest to reach and save the Dark Tower causes him to ally with Eddie Dean, a drug addict from another world's 1987 Brooklyn, Odetta Holmes, an African-American female double amputee with multiple personality disorder from another world's 1964, and Jake Chambers, a 12-year-old boy whose death in another world's 1977 has magically transported him into Mid-World.

By contrast, Plaintiff's Rook is a wealthy 1970s technophysicist who designed a chess-piece shaped time machine and advanced robots to transport himself back to the Alamo, where he saves his great grandfather, bringing him back to 1970s Arizona, where The Rook resides

2

with his girlfriend.  The Rook doesn't age, lacks the capacity for complex introspection, and does nothing more than engage in the kind of time travel adventures long ago imagined by H.G. Wells in his classic work *The Time Machine*.

Plaintiff's attempt to make two fundamentally different characters sound similar inevitably founders upon the degree of abstraction that Plaintiff must use in order to generate similarities—the degree of abstraction required to find "similarities" demonstrates that Plaintiff is trying to claim ownership of unprotectible ideas, rather than specific character details that constitute the expression of a fully delineated character that is protectible by copyright law.

This Motion will assume that Plaintiff owns the copyright upon which his claim is based. However, even when ownership is assumed, it is incontrovertible that most of the elements of Roland upon which the claim is based were created by King before The Rook was created in 1977, that Defendants did not have any relevant access to the allegedly infringed work, and even assuming for purposes of this Motion that the character of The Rook alone may be protectible by copyright law, Roland is not substantially similar in protectible expression to Plaintiff's The Rook because those few features of The Rook that are distinctively delineated are not part of the Roland character.

This is not a case in which Plaintiff can point to literal copying or even close paraphrasing or imitation of any paragraph, sentence, phrase, or illustration.  Nor does Plaintiff even attempt to establish substantial similarities of stories, in which he would need to demonstrate comprehensive taking of plot, theme, mood, pace, setting, sequence of events, or dialogue in which character would be only one component.  The Defendants collectively published eight prose novels, sixteen graphic novels, and a theatrical film without literally copying <u>anything</u> from the work Plaintiff claims to own.  Plaintiff is thus left to argue that Restin Dane (The Rook) is so distinctly developed as to command separate protection as a character, and that King's Roland character is a non-literal infringement of that character, which Plaintiff now defines with broadly phrased ideas that are virtually generic within the adventure hero genre.  The very few things that make Restin Dane distinctive, *e.g.*, his chess piece-shaped time

3

machine, are not found in Roland Deschain.  Accordingly, Plaintiff's claims should be dismissed in their entirety.

## II.  THREE TYPES OF DEFENDANTS' WORKS ARE AT ISSUE: PROSE NOVELS, GRAPHIC NOVELS, AND A THEATRICAL FILM

The Amended Complaint, Dkt. 6 ("Amd. Cplt."), in its first count, alleges that all Defendants are liable for three categories of allegedly infringing works: (1) the eight prose novels in the *Dark Tower* series authored by King and published by S&S; (2) the sixteen graphic novels in the *Dark Tower* series published by Marvel between 2007 and 2017 under license; and (3) the theatrical film, *The Dark Tower*, released in August 2017, produced by Imagine and MRC, and distributed by SPE (Exhibit 1 to Jackson Declaration, filed herewith).

The second count of the Amended Complaint alleges contributory copyright infringement against Defendants MRC and Imagine, and the third count alleges vicarious copyright infringement by Defendants King, SPE, Marvel, and S&S.

Defendants have concluded that the efficient way for this motion to analyze the allegations of the Amended Complaint is to evaluate the infringement claims in three groups: the prose novel infringement claims, the graphic novel infringement claims, and the theatrical film infringement claim.

## III.  SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure "mandates the entry of summary judgment . . . against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co*., 357 F.3d 1256, 1259–60 (11th Cir.2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id*. at 1260. All the evidence and factual inferences, reasonably drawn from the evidence must be viewed in the light most favorable to the

nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir.2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548. Plaintiff's evidence must be significantly probative in order to avoid summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)

In making this motion, defendants have met their burden to demonstrate that plaintiff is unable to establish the elements of a prima facie copyright infringement as to the elements of (1) substantial similarity of protectible expression; and (2) copying.

In copyright actions, when the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar regarding protected expression, non-infringement may be determined as a matter of law on a motion for summary judgment.  *Herzog v. Castle Rock Entertainment,* 193 F.3d 1241, 1247, 1249-59 (11th Cir. 1999); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir.1994); *Warner Bros., Inc. v. Am. Broadcasting Cos.*, 720 F.2d 231, 240 (2d Cir.1983). Similarly, summary judgment may be granted when plaintiff cannot establish copying in that there is no substantial evidence that the defendant had access to the copyrighted work before creating the allegedly infringing work. *Herzog, supra*, 193 F.3d 1241 at 1244 (summary judgment granted based on lack of access necessary to support an inference of actual copying).

## IV.    THE ELEMENTS OF A COPYRIGHT INFRINGEMENT CLAIM

To establish a *prima facie* case of infringement, a plaintiff must present substantive evidence that (1) he owns a valid copyright and that (2) the defendant has (a) actually copied (b) original protected expression from the plaintiff's copyrighted work.  *Feist Publ'ns, Inc. v.*

*Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *Calhoun v. Lillenas Publ'g*, 298 F.3d 1228, 1232 (11th Cir. 2002). 4 M. & D. Nimmer, *Nimmer On Copyright*, ("*Nimmer*") § 13.01 at 13-6 to -16 (2018). "Copying" of protected expression thus requires that Plaintiffs prove two distinct elements: actual copying and unlawful appropriation. 4 *Nimmer*, § 13.01[B] at 13-8 to -10.

Even if works were identical, no infringement would exist unless the similarities resulted from <u>actual copying</u> of plaintiff's work. *Calhoun v. Lillenas Publishing*, 298 F.3d 1228, 1232 (11th Cir. 2002); 4 *Nimmer*, § 13.01[B] at 13-9 to -11.

The <u>actual copying</u> element focuses on "the factual question whether the defendant, in creating its work, used the plaintiff's material as a model, template, or even inspiration." 4 *Nimmer*, § 13.01[B] at 13-9 (emphasis added). Proof of the "actual copying" element usually depends on circumstantial evidence. Plaintiffs must present substantive evidence that (a) the creators of Defendants' Dark Tower works had "access"—*i.e.*, a reasonable opportunity to view Plaintiff's work before creating Defendants' Dark Tower works—and (b) that the works share similarities that are "probative" of copying, *Peter Letterese & Associates, Inc. v. World Institute*, 533 F.3d 1287, 1301 (11th Cir. 2008); 4 *Nimmer*, § 13.01[B] at 13-12 to -13-14 & n.31.3.

To raise a genuine issue of access, Plaintiff has to present substantial evidence - not speculation or conjecture - that the creators of the Dark Tower works had "a 'reasonable opportunity' or 'reasonable possibility' of viewing" Plaintiff's Work before creating Defendants' Dark Tower works. *Herzog, supra*; 4 *Nimmer*, § 13.02[A]. *See Jason v. Fonda*, 698 F.2d 966, 967 (9th Cir. 1982) (a "bare possibility" insufficient).

<u>Unlawful appropriation</u>, or actionable copying, focuses on the issue of whether any alleged copying (a) extended beyond unprotectible facts, concepts or ideas (17 U.S.C. § 102(b)) to Plaintiff's protectible expression, and (b) to whether a properly instructed jury could find Plaintiff's and Defendants' works to be substantially similar. *Beal v. Paramount Pictures*, 20 F.3d 454, 459-60 (11th Cir. 1994). As the Supreme Court explained in *Feist Publ'ns v. Rural Tel. Serv. Co.*, 499 U.S. 340, 344-48, 349-50, 361 (1991): "Not all copying . . . is infringement."

When, as in this case, non-identical works are compared, the substantial similarity of protected expression inquiry asks: how far beyond the literal may plaintiff's copyright monopoly extend? Where the question requires consideration of "'concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles,…the question should be classified as one of law…'" *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 201 (9th Cir. 1989) quoting *United States v. McConney*, 728 F.2d 1195, 1202 (9th Cir. 1984) (*en banc*); 4 *Nimmer*, at § 13.03[A][1]. If a plaintiff were allowed to extend his or her monopoly too far, liability would be imposed for the use of unprotected ideas and facts – rather than protected expression – in violation of the First Amendment and copyright policy. *Feist*, 499 U.S. at 344-48, 349-50 (1991); *Harper & Row Publishers v. Nation Enter.*, 471 U.S. 539, 556, 85 L.Ed.2d 588, 105 S.Ct. 2218 (1985) (the idea/expression dichotomy strikes a constitutional balance between copyright and free speech interests). Copyright policy and free speech interests positively encourage the use of ideas from copyrighted works. *Feist*, 499 U.S. at 350. For that reason, "access" may not affect analysis of the unlawful appropriation issue.[1]

Typically, when a literary or dramatic work is alleged to infringe a plaintiff's work on a non-literal but comprehensive basis, courts analyze the selection and arrangement of theme, plot, characters, sequences of events, setting dialogue, pace and tone (or mood) to determine whether the two works are substantially the same. *See Herzog v. Castle Rock Entertainment*, 193 F.3d 1241, 1258 (11th Cir. 1999); *Beal v. Paramount Picture Corp.*, 20 F. 3d 454, 464 (11th Cir. 1992)(affirming summary judgment). For such a claim, a "character" is just one of the elements of the work and the analysis refers to its situation as a part of the whole. *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1176-77 (9th Cir. 2003). Plaintiff makes no such claim in this case, nor could he.

Instead, plaintiff claims this is one of those rare cases where a character, "The Rook," is so distinctive as to command copyright protection in and of itself, separate from the story in

---

[1] The Ninth Circuit's erroneous dalliance with a contrary rule has now been expressly overruled. *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1124-25 (9th Cir. 2018).

which it is found.  In such a case, plaintiff must show that the character either is "the story being told" or is "especially distinctive."  *Rice, supra*, 330 F.3d at 1175-76.  Here, the only distinctive features in The Rook that Plaintiff can identify are not found in Roland, such as the Rook's use of a chess piece-shaped time machine.  Since Mid-World's knightly gunslinger Roland has no meaningful similarity to the distinctive features of the wealthy 1970s technophysicist The Rook, Defendants are entitled to judgment.  *See* discussion *infra*, at VIII.B, IX.A, and X.A.

## V.      THE COPYRIGHT SUED UPON

Plaintiff alleges that he ". . . is the legal owner of the copyright for the work entitled The Rook, which is registered with the United States Copyright Office in Registration No. B188968 with a registration date of February 4, 1977, and an initial publication date of January 19, 1977." Amd. Cplt. ¶21.  The deposit copy for B188968 is Eerie 82.[2]  Plaintiff alleges that his ownership derives from two sources of succession.  He alleges that he is ". . . successor to William B. DuBay and Warren Publishing Company."  Amd. Cplt. ¶22.  This motion does not dispute ownership.

## VI.     PLAINTIFF'S CLAIMS ARE SO BROAD THAT RELIANCE UPON SUMMARIES IS PERMISSIBLE

In his Amd. Cplt., Plaintiff alleges that he is "copyright owner of Restin Dane" (¶65),[3] and that Defendants' character, Roland Deschain, as he appears in *The Dark Tower* prose novels, the Marvel graphic novels, and the 2017 theatrical feature film *The Dark Tower*, is substantially similar to Plaintiff's character Restin Dane, and was actually copied from The Rook  (¶67).  The central logistic issue that this Motion, and indeed this case, poses for the Court arises from the vastness of Plaintiff's claim.  Plaintiff claims that eight prose novels written by Stephen King and published by Simon & Schuster (composed of more than 4,200 pages, sixteen substantial

---

[2] *Eerie* 82 is filed herewith as Exhibit 16.

[3] The only copyright that Plaintiff identifies in the Amended Complaint as having been registered, and infringed, is Copyright Registration No. B188968, for which the deposit material was *Eerie 82*, published in January 1977.  Amd. Cplt. ¶21.  *See* Registration, Ex.17, filed herewith.

*Dark Tower* graphic novels created by Marvel under a license from King, and a 2017 theatrical feature film, all constitute infringements because they include a character, Roland Deschain, that Plaintiff claims is substantially similar to, and copied from, the 1977 comic character The Rook. None of the allegedly infringing works are alleged to contain elements that literally copy The Rook.  Given that the vast majority of the allegedly infringing works have nothing to do with the infringement claim, Defendants do not think it is realistic to expect the Court to devote itself to lengthy immersion in the allegedly infringing works.  For that reason, Defendants engaged Robin Furth, the world's foremost expert on *The Dark Tower*, and author of *Stephen King's The Dark Tower: The Complete Concordance* (Scribner, 2012) to prepare a detailed objective summary of Roland Deschain's character arc as manifested in the Simon & Schuster prose novels and the Marvel graphic novels.  Furth Decl. Ex. 2.  That summary is annotated to prose novel and graphic novel excerpts, and explains Roland's detailed evolution within them.  The Furth summary, together with the expert report of screenwriter Bob Gale, demonstrate the absence of substantial similarity by King's Roland character to the Restin Dane comic magazine character that Plaintiff claims to own.

Federal Rule of Evidence 1006 allows parties to prove contents of voluminous writings which cannot be examined in court without causing inconvenience and waste of time by presenting evidence of their contents in the form of written summaries.  The Furth summaries and the Gale analysis are important because they demonstrate that Roland Deschain is a qualitatively different sort of character than The Rook.  Roland Deschain is a dark, complex, introspective character capable of evil, and hungering for the redemption that he thinks will come from the fulfillment of his quest to save the entire universe of all universes.  The Rook is a two-dimensional comic book character who does not age, grow or evolve.  The simplest way to analyze and dispose of this claim is to compare the two characters, but that comparison can only be relatively "simple" if the Court uses the summaries that Defendants have tendered to the court.  If Plaintiff claims that the summaries of Roland from the prose novels and Marvel Comics are inaccurate, and that the Court needs to view the works in their entirety, he can place them

9

before the court in his opposition to this Motion.  Such a tactic will inflict needless burden, but will lead to the same result.

## VII.     THE CREATION AND 1977 PUBLICATION OF THE ROOK

Plaintiff claims to be the owner of the copyright for the character "The Rook" apart from the comic book work entitled The Rook, registered with the United States Copyright Office in Registration No. B188968 with a registration date of February 4, 1977 and an initial publication date of January 19, 1977.  Amd. Cplt. ¶21.  Initial authorship of the work was by Warren Publishing Company, a sole proprietorship of James Warren.  (DuBay Answer to MRC Interrogatory 9, Ex. 37; Copyright certificate B188968 for *Eerie* 82, Ex.17)  Three individuals created the character at the instance and expense of Warren as a work made for hire—William B. DuBay, Budd Lewis, and Jim Stenstrum.  B. DuBay Dep. 64:22-66:5; 91:1-14; 252:25-253:8 (an excerpt of the B. DuBay Deposition is attached hereto as Exhibit 30).  Plaintiff alleges that the character The Rook was distributed in comic magazine copies throughout the United States from January 1977 to March 1983.  Amd. Cplt. ¶18.

William B. DuBay, who died in 2010, never claimed that The Rook was infringed by Stephen King, B. DuBay Dep. 50:5-23, despite the fact that he owned and was quite familiar with many of King's works and had loaned copies of King's novels to his son.  William DuBay, Jr. Decl. ¶4.  There is no evidence that Budd Lewis, who died in 2014, ever claimed that any work by Stephen King infringed The Rook.  The only surviving member of the trio who created The Rook, Jim Stenstrum, testified that he read or listened to the book or audiobook for all of Defendants' *Dark Tower* prose works beginning in 2010 and that he saw no meaningful similarity between The Rook and Roland Deschain.  Stenstrum Dep. 75:2-76:5 (An excerpt of the J. Stenstrum Deposition is attached hereto as Exhibit 31).  Indeed, Stenstrum testified at his deposition that the character of The Rook, as drawn by him, was derived in part from the visual image of the protagonist played by Rod Taylor in the film *The Time Machine* (1960).  *Id*. at p. 53:16-54:7.  Stenstrum also testified to his awareness in 1977 of multiple comic, film, and

television characters who had similarities to The Rook, such as Doc Savage and Rip Hunter.  *Id*.
at p. 33:5-34:14; 63:13-64:17.  To Stenstrum, there was nothing special about Restin Dane other
than the fact that he liked to dress up as a cowboy.  *Id*. at 90:5-92:9.

## VIII.   THE *DARK TOWER* PROSE NOVEL WORKS ARE NOT INFRINGING

### A.   Roland's Creation Before 1977 and King's Continuing Creative Role

Stephen King's long creative process that led to *The Dark Tower* prose novel series,
including his protagonist Roland Deschain, began in the 1960s.  King Decl. ¶5.  Reading J.R.R.
Tolkien's epic fantasy *The Lord of the Rings* at that time caused him to start thinking about
creating his own epic fantasy that would include a quest by a fellowship of seekers.  Another
inspiration for *The Dark Tower* came from Robert Browning's 19th century poem "Childe
Roland to the Dark Tower Came" which he read in about 1968 while a student at the University
of Maine.  That poem depicts a young man, a romantic hero, on a quest for a mysterious dark
tower.  The epigraph to the poem indicates that Browning's inspiration came from lines of
dialogue in Shakespeare's play *King Lear* spoken by the Earl of Gloucester's good-hearted son
Edgar, when he pretends to be a madman named "Poor Tom" and encounters Lear wandering on
the heath.  "Poor Tom" says, in part:

> "*Child Rowland* to *the dark tower* came,
> His word was still Fie, foh and fum
> I smell the blood of a British man"

*King Lear*, Act 3, sc. 4. (emphasis added).  *Id*.

A further inspiration for King's creation of Roland Deschain was the character played by
Clint Eastwood known as "The Man With No Name" in a series of so-called "spaghetti
westerns" directed by Sergio Leone beginning in the 1960s, in particular the 1966 film *The
Good, The Bad, and The Ugly* (a DVD copy of which is attached hereto as Exhibit 18).  King
was also inspired by the parallel worlds scenario of Clifford Simak's novel *Ring Around the Sun*
(1953).  King Decl. ¶8.

In about April 1970 (seven years before publication of The Rook), King started writing "The Gunslinger."  He wrote the first draft of the entire work in 1970, and worked on it intermittently over the next 7 to 8 years.  King Decl. ¶9.  He came to plan it as the first volume of an epic fantasy 7-volume series, and  finished the seventh volume in 2002, about 32 years after he started writing "The Gunslinger."  The protagonist of *The Dark Tower* series is Roland Deschain of Gilead, a gunslinger who is an unusual combination of knight errant and territorial marshal of the old West.  His backstory is that he is a descendant from the line of the old White King, known as Arthur Eld, and resides in Mid-World, which is one of the worlds that lies next to our world, though there are many overlaps.  In the architecture of the multiverse within *The Dark Tower* series of books, there are places that are doorways or portals between the worlds, and sometimes there are thin places, porous places, where two worlds actually mingle.  These adjacent worlds are not necessarily synchronized in time, so that passage through a portal can take one to a different era.  King Decl. ¶¶8-9.

In 1974, after King's first published novel *Carrie* had been accepted for publication, he moved with his family to Boulder, Colorado. While there, he worked on two novels with Colorado settings, *The Shining* and *The Stand*.  He brought with him to Colorado his more than 120-page single-spaced typewritten manuscript for "The Gunslinger," and in 1975 would from time to time have a secretarial student, Denice May, retype revised portions of his second draft 1972 manuscript.  She retyped the work double-spaced, with an electric typewriter.  King Decl. ¶¶19-23; Kelly Decl. ¶3.  Most of those pages have survived, King Decl., Ex.2, pp. 2-136 and 151-165, and from them we can see that, by 1975, the essential components of the Roland character had already been created.

In the 1975 manuscript, King Decl. Ex. 2, (two years before The Rook) Roland is obsessed by his pursuit of the mysterious, magical, and evil Man in Black.  He is a gunslinger, a member of a hereditary caste of latter-day knights errant who have been trained to use their revolvers to right wrongs and protect society.  He is dressed in western outdoor wear, with jeans, a wide-brimmed hat, two guns, and a gun belt.  He is a romantic hero, attractive to women.  He

12

encounters a talking raven named Zoltan, a fighting hawk named David, and portentous rooks and crows at the hanging of a traitor.  He is a fearless monster-fighter, fighting mutants.  He meets a young boy from another world who describes that world (which is similar to our world in the 1970s) in terms that Roland cannot understand because they differ so dramatically from his own place and time.  His obsession with the pursuit of the dark man, and thus the Tower, is so great that he is willing to sacrifice the life of this young boy in order to defeat the man in black.  See King Decl. Ex. 2.

The contents of the first book, *The Gunslinger*, were first published as a series of installments in issues of *The Magazine of Fantasy and Science Fiction* commencing with the October 1978 issue.  In addition, King revised the first volume of *The Dark Tower* series, *The Gunslinger*, for publication in 2003 because after finishing his work on the first seven volumes he felt that the original version of the first book was dry and difficult for new readers to access, and did not reflect his growth as a writer since 1970.[4]  He also wanted to make the book's plot more consistent with the ending of the series after he had completed the first seven works, and wanted to add material to improve the continuity among the volumes, such as including Roland's surname, Deschain, that had first been introduced in 1997 in *The Dark Tower IV: Wizard and Glass*.  *Id*. at ¶11.

The table below sets forth the titles and years of first publication of the eight books that make up *The Dark Tower* prose novels and include Roland Deschain:

| Title | First Publication in Book Form |
|---|---|
| *The Dark Tower: The Gunslinger* | 1982; 2003 |
| *The Dark Tower II: The Drawing of the Three* | 1987 |
| *The Dark Tower III: The Waste Lands* | 1991 |
| *The Dark Tower IV: Wizard and Glass* | 1997 |
| *The Dark Tower: The Wind Through the* | 2012 |

---

[4] The 2016 trade paperback version of the 2003 edition of *The Gunslinger* is lodged as Exhibit 24.  The 1988 trade paperback version of the 1982 edition of *The Gunslinger* is lodged as Exhibit 25.

| | |
|---|---|
| *Keyhole [The Dark Tower IV-1/2]* | |
| *The Dark Tower V: Wolves of the Calla* | 2003 |
| *The Dark Tower VI: Song of Susannah* | 2004 |
| *The Dark Tower VII: The Dark Tower* | 2004 |

**B.    Roland**

### Deschain in the Prose Novels is Not Substantially Similar to Protected Expression in the Restin Dane Character

Plaintiff alleges, Amd. Cplt. ¶¶65, 67, that Defendants committed copyright infringement because Stephen King copied the character Restin Dane by making the *Dark Tower* character Roland Deschain substantially similar to protectible expression in Restin Dane.[5]

Robin Furth's detailed objective character arc analyses of Roland Deschain as he appears in the eight *Dark Tower* prose novels, and the 16 Marvel graphic novels were provided to Defendants' second expert, Bob Gale, who relied upon Furth's analyses; read some of the prose novels, as well as excerpts from those books, the 16 Marvel graphic novels; and viewed the 2017 feature film *The Dark Tower*.  Gale, a co-author of the screenplays for the *Back to the Future* films and Writers Guild credits arbitrator, is expert in the science fiction and fantasy genres, and has prepared a detailed report analyzing the alleged similarities, Gale Decl., Ex. 1.

Once one apprehends the nature of Roland and his many differences from The Rook, application of copyright principles requires the entry of judgment.  Because it is well-established that copyright protection "does not extend to any underlying facts or ideas," *BUC Int'l Corp. v. Int'l Yacht Council Ltd*., 489 F.3d 1129, 1140 (11th Cir. 2007), copyright protection for characters only extends to characters who are distinctively delineated, and only protects against the copying of the elements that distinctively delineate the character.  As *BUC Int'l Corp.* noted, if one were to assume that the book *Moby Dick* were not in the public domain, copyright law would not protect the idea of a determined captain hunting a giant whale.  But copyright law

---

[5] Asked in a series of interrogatories to specify as to each Dark Tower prose work the elements of similarity upon which he bases his infringement claim, plaintiff repeatedly stated his contention that the works were substantially similar was based upon the identical idea-based and character-based  formula as to each work. See Plaintiff Response to S & S Interrogatories 1-11, Ex. 20.  None of the elements of purported similarity are distinctively delineated character elements; they are each generic ideas within the adventure hero model.

would protect Ahab as the particular expression of this idea in the book, *Moby Dick*. *Id.*, at 1143. *See* Eleventh Circuit Pattern Jury Instructions, 9.10 (2013 rev.).

The starting point for discussion of copyright's protection of character is *Nichols v. Universal Pictures Corp.*, 45 F.2d 119 (2d Cir. 1930). There, plaintiff alleged infringement of a play, *Abie's Irish Rose*, by a film, *The Cohens and the Kellys*, both of which dealt with the theme of interfaith romance. Judge Hand recognized that in any work of a similar type there are stock plots and stock characters, and that copyright law protected only the expressive elements an author places upon an abstract stock character. *Id.*, 45 F.2d at 121. Using Shakespeare to illustrate fully developed characters, he wrote:

> "If *Twelfth Night* were copyrighted, it is quite possible that a second comer might so closely imitate Sir Toby Belch or Malvolio as to infringe, but it would not be enough that for one of his characters he cast a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress. These would be no more than Shakespeare's "ideas" in the play, as little capable of monopoly as Einstein's Doctrine of Relativity, or Darwin's theory of the origin of the species. It follows that the less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly.

*Id.*

Nimmer's treatise on copyright law distills the character infringement analysis into two questions: "First, was the character as originally conceived and presented sufficiently developed to command copyright protection? Second, if so, did the alleged infringer copy that development itself, rather than merely a broader and more abstract outline?" 1 M.&D. Nimmer, *Nimmer on Copyright*, §2.27 at 2-163 (2018) ("*Nimmer*") (footnotes omitted). When characters in copyrighted works are afforded copyright protection outside of the works they are found in, they "have displayed consistent, widely identifiable traits." *Toho Co. Ltd. v. William Morrow & Co.,*

*Inc.*, 33 F.Supp.2d 1206, 1215 (C.D. Cal. 1998) (affording copyright protection to the character "Godzilla"); *Metro Goldwyn Mayer, Inc. v. American Honda Motor Corp.*, 900 F.Supp. 1287, 1297 (C.D. Cal 1995) (James Bond); *Metro Goldwyn Mayer, Inc. v. Showcase Atlanta Co-op Productions, Inc.*, 479 F.Supp. 351 (N.D. Ga. 1979) (Scarlett O'Hara and Rhett Butler).  Courts thus frequently point out that "[t]he bar for substantial similarity in a character is set quite high." *E.g., Sheldon Abend Revocable Trust v. Spielberg*, 748 F.Supp.2d 200, 208 (S.D. N.Y. 2010).

Substantial similarity in characters cannot be based on shared attributes of appearance and demeanor that are generic to a particular type of character, *Rice v. Fox Broad. Co*, 330 F.3d 1170, 1176 (9th Cir. 2003).  Similarities that "flow naturally from the works' shared premises" also are unprotected, *Benay v. Warner Bros Entertainment, Inc.*, 607 F.3d 620, 626 (9th Cir. 2010).  Courts must ". . . slice or filter out the unprotectible elements" that arise from the embodiment of stock ideas in characters in a work."  *Bissoon-Dath v. Sony Computer Entm't Am., Inc.*, 694 F.Supp.2d 1071, 1087 (N.D. Cal. 2010) *aff'd sub nom.  Dath v. Sony Computer Entm't Am., Inc.*, 653 F.3d 898 (9th Cir. 2011).

The element of time travel[6] is so widespread within science fiction that at least one court has expressly said that it's not protectible.  *Feldman v. Twentieth Century Fox Film Corp.*, 723 F.Supp.2d 357, 366 (D. Mass. 2010) (". . . time travel is a general idea that is not subject to copyright protection.  Indeed, voluntary time travel is a common trope in many television shows . . . . Many of the alleged infringing elements are uncopyrightable scenes-a-faire, or stock scenes, inherent in the portrayal of time travel.").

Furthermore, "the doctrine of scenes-a-faire denies copyright protection to elements of the work that are for all practical purposes indispensable, or at least customary, in the treatment of a given subject matter."  *Coquico, Inc. v. Rodriguez-Miranda*, 562 F.3d 62, 68 (1st Cir. 2009).  *See Herzog v Castle Rock Entm't*, 193 F.3d 1241, 1259 (11th Cir. 1999) (explaining that

---

[6] Plaintiff's Rook builds a time machine *a la* H.G. Wells.  Roland travels between different worlds that are not synchronized in time.  Defendants dispute that Roland's parallel world travel is time travel, but because no author can own time travel, the distinction is immaterial to the analysis.

16

"characters who keep secrets are part and parcel of the murder mystery genre and are not protectible"); *Whitehead v. Paramount Pictures Corp.*, 53 F.Supp.2d 38, 50 (D.D.C. 1999) ("general characteristics such as black hair, intelligence, patriotism, and slight paranoia . . . are not copyrightable and do not establish substantial similarity"); *Hogan v. DC Comics*, 48 F.Supp.2d 298 (S.D.N.Y. 1999) (no substantial similarity between two young male half-vampire characters named Nicholas Gaunt who both had similar appearances, both experience flashbacks as part of their quest to discover their origins, and both became killers;" *Cabell v. Sony Pictures Entm't, Inc.*, 714 F.Supp.2d 452, 454 (S.D.N.Y. 2010) (granting summary judgment to a defendant where the main characters were both military-trained hair stylists who fight crime and wield hairdryers as weapons; *Arden v. Columbia Pictures Indus., Inc.*, 908 F.Supp. 1248, 1261 (S.D.N.Y. 1995) (no substantial similarity between two self-centered bachelors in their mid-30s who pursued love interests and became trapped in a repeating day).[7]

Substantial similarity between the Plaintiff's and Defendants' works can only be demonstrated when "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *SunTrust Bank v. Houghton Mifflin Co.*, 286 F.3d 1257, 1266 (11th Cir. 2001). The absence of substantial similarity may be determined as a matter of law at the summary judgment stage when no reasonable jury could find substantial similarity. *Beal v. Paramount Pictures Corp.*, *supra*, 20 F.3d at 459 (affirming summary judgment, noting that the characterizations of the two protagonists "vary greatly").

As the test for character protection has evolved, only "characters that are 'especially distinctive' or the 'story being told'[8] receive protection apart from the copyrighted work." *Rice*

---

[7] Any attempt by Plaintiff to claim protection for The Rook as a compilation of unprotectible elements will fail because it is well-established that literary works such as The Rook are not compilations within the meaning of the Copyright Act, *i.e.*, a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. §101. *See Peter Letterese and Associates, supra*, 533 F.3d at 1301, n. 17.

[8] Since Plaintiff does not contend that the stories of The Dark Tower and The Rook are substantially similar in protectible expression, the "story being told" test for character protection has no application to the present case, inasmuch as Plaintiff concedes that different stories are being told.

*v. Fox Broad. Co.*, *supra*, 330 F.3d at 1175.

As thoroughly explained in the Gale Expert Report, Supplemental Report, and Rebuttal Report, Gale Decl., Exs. 1, 2, and 3, Plaintiff misrepresents and/or overstates similarities between Rook and Roland. Plaintiff says that each character is a:

> "quasi-immortal, time-traveling, monster-fighting, romantic adventure hero who traverses time through dimensional doors connected to a tower (in the aesthetical likeness of Rook Manor), who is symbolized by a rook bird, who descends from a familial line of gunslingers (and an immortal) and who dresses in cowboy garb despite not being from the Old West, and who is graphically depicted in the aesthetical likeness of Restin Dane as well having been similarly named consistent with an admitted signature symbolization device of Defendant King's".

Pltf. Resp to King's First Set of Interrogatories Int.1, 7, and 8 (attached hereto as Exhibit 38). The only part of that description that is true is that both experience time distortion (Roland in the most abstract, generic sense), and are monster fighting (against very different types of monsters) adventurers who have the same initials.  See Gale Decl. Ex. 1 at p. 41.

### 1.     The Restin Dane (Rook) Character

The Restin Dane character is intended to be the American grandson of Adam Dane, who invented a time machine in 1892, and was the unnamed protagonist of H. G. Wells' novel, The Time Machine.  Restin's interest in time travel stemmed from discovering Adam Dane's journals. Restin's father Richard was sent to America and eventually became a diplomat, dying in Cambodia.  Gale Decl. Ex. 1 at p. 19.

By the year 1977, Restin Dane has become a "Technophysicist," an expert in physics, computers and "robotronics."  He is very wealthy; has invented all varieties of robots; is in a partnership with the US government to develop "mandroids," and is based near Cottonwood, Arizona.  He has invented at least two versions of time machines.  One is built into a large chess Rook (and there are two of these), and another is in the shape of a chess Knight.  Restin

discovered that there are "time fragments" and these fragments, of varying lengths, are the points in time to which he can travel in his rook machines in a process he terms "time castling."  The names of his robots indicate he has a sense of humor.

In addition to his interest in chess imagery, Restin sports the image of a crow (a rook) on his belt buckle, and dresses like a cowboy, although with incongruous bell bottomed trousers.  His "uniform" is basically these trousers and belt, a long-sleeved white shirt (which was always torn on the cover images), a dark vest and optional cowboy hat with a concho hatband.  He usually carries a revolver, a Bowie knife and a submachine gun on his adventures, and is (as we'd expect) a crack shot.

Restin Dane shares numerous traits and attributes with other traditional heroes from comic books, movies, television and radio shows, pulp fiction, mythology, and folklore.  He is classically handsome and masculine, and in the prime of his life.  He is brave, courageous, honorable, resourceful, and intelligent; he is liked and respected by others, and can be counted on to "do the right thing."  He is selfless and puts his duty above his personal desires.  He is tough, tenacious, and a capable fighter.  He has adventures in many locales.  He is unmarried.  He's romantic and likes women, who find him very attractive.  He avoids killing.  He battles evil-doers, robots and monsters and has a variety of adversaries.  He has assistants/sidekicks.  His heroic qualities remain consistent through the course of his many adventures – in other words, his character does not grow or change in a classical dramatic character arc, just as The Lone Ranger, James Bond, Batman, Superman and Tarzan have remained basically consistent over their decades of adventures.   These traits are what we expect in heroes (particularly adventure heroes), and are so common as to be considered clichés.  Gale Decl., Ex. 1 at 20.  The Rook also possesses character traits of a subset of adventure hero, the scientist adventure hero, that are so widely used as to be unoriginal.  He is wealthy; an inventor; has a home base; has a state-of-the-art lab, travels through time, has a time machine, has an emblem with an animal; and uses chess imagery.  Gale Decl., Ex. 1 at pp. 20-21.

The Rook has, at most, four character traits that are distinctively developed:

    a.      He travels through time in a time machine shaped like a giant rook chess piece which he invented.

    b.      He is the grandson of the protagonist of H.G. Wells' The Time Machine.

    c.      His own great-great-grandfather is part of his team.

    d.      He is assisted by a robot butler who is a parody of a British butler.

Gale Decl., Ex. 1 at p. 43.

None of those four character traits are found in Roland Deschain.

### 2. King's Roland Deschain Character

Roland Deschain of the novels and comics is a much darker, edgier character and far more than a two-dimensional comic book character. He's full of darkness so that there's a reason to let some light in.  He is a sinner so that he can be redeemed.  He has life lessons to learn.  He does things that The Rook would never, ever do – or couldn't ever do . . . Roland lies, kills innocent people, kills his own mother, betrays his own friends, acts selfishly, consorts with both a prostitute and succubus, allows a boy to fall to his death and recognizes he is damned.  Roland smokes, he ages, he loses two fingers and a toe, he fathers a demon-son, and uses people.  He lives in a different dimension and speaks in a different dialect. He's a drifter with no home and no living blood relatives (until his demon son is born in Book V).  He was born into a caste and had no choice regarding his destiny.  He has super-natural powers of hypnotism, and can meld his mind into those of others.  He's ignorant of technology, he's not an inventor, he has little imagination and no sense of humor.  His crew (*ka-tet*) comprises a heroin junkie, a paraplegic black woman with a split personality and a 12-year old boy, while Restin's crew comprises his great-great-grandfather gunfighter cowboy Bishop from 1874, and the robot Manners. Gale Decl., Ex. 1 at p. 40.

Characters who lack similarity in their <u>distinctive</u> traits that make them protectible, and who are otherwise this different, cannot possibly be "substantially similar" within the meaning of copyright law.  None of the four Rook character traits that are distinctively developed are

possessed by Roland Deschain.  Since a finding of actionable character similarity requires that "plaintiff's original conception sufficiently developed the character, and <u>defendants have copied this development and not merely the broader outlines</u>," *Smith v Weinstein*, 578 F.Supp. 1297, 1303 (S.D.N.Y. 1984) *aff'd per curiam* 738 F.2d 419 (2d Cir. 1984) (emphasis added), plaintiff's character infringement claim must fail.[9]

The chart below illustrates some of the many differences between Roland Deschain and The Rook that preclude a finding of substantial similarity:

| Roland<br>*(unless otherwise noted,<br>descriptions apply to Book I)* | The Rook |
|---|---|
| Lives on Mid-World | Lives in Arizona |
| As an adult, he has no home – he's a nomad. | Lives in Rook Manor |
| Is ignorant of technology | Is a famed inventor and genius |
| Doesn't understand the concept of a time machine | Invented a time machine |
| Cannot travel through time whenever he wants | Can travel through time whenever he wants |
| As an adult, he has no living ancestors | He rescues his great-great-grandfather who becomes his best male ally. |
| His grandfather was a member of the Gunslinger caste. | His grandfather invented a time machine and was the protagonist of H.G. Wells' novel. |
| His father was the leader of the Gunslinger caste. | His father was a diplomat. |
| He speaks in a stilted dialect of English. | He speaks in normal, American English. |
| He becomes possessed by a demon spirit and kills his mother. (Book IV) | We never meet his mother, and he never mentions her. |
| He has one constant nemesis: The Man in Black, aka Walter O'Dim aka Randall Flagg aka Marten Broadcloak, who serves The Crimson King. | He has a variety of unaffiliated enemies, including Gat Hawkins, Granny Gadget, the Mandroid, and Robur the Conqueror. |
| He is on his quest for The Dark Tower at the start of Book I, and it's his sole focus for all | He is not on any long-term quest. |

---

[9] Regarding the substantial similarity inquiry as to characters, the Second Circuit has stated: "Stirring one's memory of a copyrighted character is not the same as appearing to be substantially similar to that character, and only the latter is infringement." *Warner Bros. Inc. v American Broadcasting Co.*, 720 F.2d 231, 242 (2d Cir. 1983).

| | |
|---|---|
| seven books. | |
| His crew consists of a heroin addict, a paraplegic black woman with a split personality and a 12-year-old boy (Book II) | His crew consists of his great-great-grandfather cowboy gunfighter, and his robot assistant "Manners." |
| His crew travels with a pet "Billy Bumbler" (Book III) | Neither he nor any of his group have any pets. |
| Per the author's description, his hair is gray at the temples, his face has deep lines and his skin is dry<br>(End of Book I until the end of the series) | His hair is black; his complexion is without lines or blemishes. |
| He loses two fingers of his right hand and a big toe to a giant lobster. (Book III) | He never suffers any permanent injuries. |
| At age 14, he gets a girl, Susan Delgado, pregnant, then leaves her to die. (Book IV) | We know nothing of his past, but this is not something he would do. |
| He has sexual relations with Alice in Tull, not because he cares for her, but out of convenience, and later kills her. | His sex life is not clear, but he may be sleeping with January and/or Kate, but doesn't and wouldn't kill either. |
| He shoves his pistol into the vagina of the preacher woman of Tull, then rapes her. | Restin Dane couldn't even conceive of doing anything like this! |
| He shoots some innocent townspeople who are running away from him in the back. | He doesn't shoot people in the back. |
| In Book I, he forms a relationship with a boy, Jake, and then lets him die to further his own ends. | In The Rook #8, he forms a relationship with a boy, Billy, and does everything he can to ensure the boy's safety. |
| He is descended from Arthur Eld, Mid-World's version of King Arthur. | He is descended from Quarb, a prehistoric immortal who looks like Hugh Hefner. |
| He smokes. | He doesn't smoke. |
| He massacres everyone in the town of Tull, including women and children, never considering an alternative. | He doesn't massacre any towns or kill innocent people. |
| He lies (constantly telling Jake not to worry when he knows he's going to have to sacrifice him) | He tells the truth. |
| He never goes to outer space. | He has several adventures in outer space. |
| He has the super-power to hypnotize. | He has no super-powers. |
| He believes in magic. | He believes in science. |
| He can enter the consciousness of other people (Book II) | He cannot enter anyone else's consciousness. |

22

| | |
|---|---|
| He doesn't trust people, and they don't trust him. | He is entirely trustworthy. |
| He sacrifices his own pet hawk because it suits his ends. | He does not kill animals except in self-defense. |
| He is usually grim and has no sense of humor. | He clearly has a sense of humor, given the names of his robots, and it's also seen in his relationship with his great-great-grandfather. |
| He robs a gun store. (Book II) | He does not rob any stores. |
| He recognizes that his terrible acts have damned him. | He has no reason to think he is damned. |
| He is stuck in a time loop. (Book VII) | He is not stuck in any time loops, nor does he ever encounter one. |
| He doesn't have an automatic weapon. | He carries and uses a submachine gun. |
| He takes mescaline. | He doesn't do drugs. |
| He consorts with a succubus. | He never sees any such demons. |
| He ages ten years at end of Book I. | He never appears to age. |
| His character changes in the course of his journey. (Books II, III, IV, V, VI and VII.) | He undergoes no character change. |
| He meets his creator, Stephen King (Book VI) | He never meets his creators. |
| He unknowingly fathers a demon-son, Mordred, part human, part giant spider, as a result of his sexual encounter with a succubus. (Books V-VII) | He learns he has a daughter, Coral, in the future, living on a moon of Jupiter.  As an adult woman, she goes back in time to find him. |

In sum, no reasonable reader could possibly regard Roland Deschain to be substantially similar to the elements that are distinctive in Restin Dane.  Absent similarity in these distinctive elements, no properly instructed jury could find substantial similarity.

> **C.  Stephen King and the Allegedly Infringing Prose Novel Visual Artists Did Not Have Access to the Copyrighted Work**

In order for Plaintiff to prove that King copied "constituent elements of the copyrighted work that are original," *Feist Publications, Inc. v. Rural Tel. Serve. Co.*, 499 U.S. 340, 361

(1991), plaintiff, in a case such as this,[10] must show that King had access, *i.e.*, a reasonable opportunity to view, The Rook before he created Roland.  Plaintiff's need to demonstrate that access to The Rook occurred prior to King's creation of Roland is logically necessary, because access is only relevant to demonstrate copying in fact, and if The Rook did not yet exist, there could be no copying.  *See Armour v. Knowles,* 512 F.3d 147, 152-53 (5th Cir. 2007); *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004).

Here, before the creation of The Rook in 1977, the 1975 manuscript from the University of Maine Fogler Library[11] shows that Defendants' Roland, as he existed in 1975, was a gunslinger, dressed in a western style but not from the old west, a romantic protagonist obsessed with his quest for the Tower, possessed of extraordinary gunslinging skills, who encounters a talking raven, uses a fighting hawk, and sees rooks and crows at a gallows scene.  King Decl. Ex. 2.  Plaintiff cannot point to any material subsequent change to Roland that transformed him into an infringement.

Furthermore, King never saw, discussed, or heard about The Rook prior to learning of Plaintiff's claim.  King Decl., ¶12.  There is no evidence that any of the illustrators for the novels ever saw The Rook.  *See* Whelan Decl. ¶6-7; Lee Decl. ¶9-13.  Even if Plaintiff were able to show that the illustrators had access to The Rook, the claim would fail because Plaintiff cannot show the kind of similarity of expression between Defendants' images and any image that he claims to own.

Plaintiff's failure to establish relevant access that would support an inference of actual copying is a separate and independent basis for summary judgment.  *Herzog, supra*, 193 F.3d at 1244.

---

[10] This is not a case in which a plaintiff has put forth expert evidence that the putative infringing work is so strikingly similar to the plaintiff's work that copying is the only possible explanation. *See Herzog v. Castle Rock Entertainment*, 193 F.3d 1241, 1249 (11th Cir. 1999); *Benson v. Coca-Cola Co.*, 795 F.2d 973, 975 n.2 (11th Cir. 1986) (*en banc*).

[11] It is filed and lodged as Exhibit 1 to the Declaration of Desiree Butterfield-Nagy.

## IX.    *THE DARK TOWER* GRAPHIC NOVEL WORKS ARE NOT INFRINGING

Between 2007 and 2017, Marvel published licensed graphic novels that were based upon prose novels written by Stephen King in the *Dark Tower* series.  Furth Decl., ¶6.  The 16 *Dark Tower* graphic novels published by Marvel are listed in Furth Decl., Ex. 1, pp. 7-8.[12]

Like the *Dark Tower* prose novels, the *Dark Tower* graphic novels also focus on the adventures of Roland Deschain, a gunslinger-knight wandering the ruins of his world, seeking a mysterious structure called the Dark Tower, which is the linchpin of the time/space continuum. But while the *Dark Tower* novels focus on the adult Roland, a man whose worst crimes have already been committed and who—over the course of the series—seeks repentance and renewal, the majority of the *Dark Tower* graphic novels focus on the young man, and examine the events and experiences that transformed him from a naïve apprentice gunslinger into a hardened killer. Furth Decl. Ex. 1, p. 24.

The *Dark Tower* graphic novels consist of sixteen books, divided into three story arcs. The first arc (*The Gunslinger Born, The Long Road Home, Treachery, The Fall of Gilead*, and *The Battle of Jericho Hill*), begins with Roland winning his guns at age fourteen, and continues until the gunslingers' last stand at the Battle of Jericho Hill, where all of the gunslingers (other than Roland) were slaughtered. In this story arc, Roland changes profoundly, from a prodigiously talented but naïve apprentice gunslinger who is devoted to his young *ka-tet*, into a battle-hardened young man who has—directly or indirectly—brought about the deaths of almost everyone he has ever loved.  Furth Decl., Ex. 1, p. 24-33.

By the beginning of the second arc (*The Journey Begins, The Little Sisters of Eluria, The Battle of Tull, The Way Station*, and *The Man in Black*), Roland is a very different character from the idealistic apprentice gunslinger we met at the beginning of *The Gunslinger Born*. His early, naïve belief that good must always triumph over evil has been shattered. His friends are dead, he has been spat upon by his enemies, and he has risen from a pile of corpses, crying out that he will

---

[12] A copy of the first work in the series, *The Dark Tower: The Gunslinger Born* (2007) is filed herewith as Exhibit 21.

climb to the top of the Dark Tower and demand justice from whatever god or demon resides there. Roland is now a loner, and is as likely to shoot those he meets as he is to save them. In short, he has become the bitter, lonely, and dangerous drifter we met in King's first *Dark Tower* novel, *The Gunslinger*--a man able to sacrifice a young and trusting boy in order to pursue his quest.  Furth Decl., Ex. 1, p.33-41.

The third arc (*The Prisoner, House of Cards, The Lady of Shadows, Bitter Medicine*, and *The Sailor*) adapts King's second *Dark Tower* novel, *The Drawing of the Three*, and the first part of the third *Dark Tower* novel, *The Waste Lands*. In these five graphic novels, Roland learns to love again and begins to reclaim his soul. The final graphic novel—*Last Shots*—contains four stand-alone Mid-World tales that do not directly concern Roland's growth and transformation. Furth Decl., Ex. 1, p. 24, 42-48.

The graphic novels depart somewhat from Roland's character arc as it is depicted in Stephen King's original prose novels. At the end of King's prose novel, *Wizard and Glass*, Roland abandons his pregnant young lover, Susan Delgado, so that he can pursue his quest for the Tower. In the graphic novel *The Gunslinger Born*, filed as Exhibit 21, Roland fully intends to bring Susan with him to Gilead. However, due to Roland's naiveté and poor judgment, coupled with the cruelty of fate, Susan is caught by Roland's enemies. In both versions of the tale, Susan is burned to death, an execution that Roland witnesses in the magical evil-seeing sphere, Maerlyn's Grapefruit. The fundamental difference between these two versions of the tale is the level of Roland's culpability.  Furth Decl. Ex. 1, p. 25.  Neither version presents a Roland substantially similar to The Rook.

A.    **Roland Deschain in the Graphic Novels is Not Substantially Similar to Protected Expression in Restin Dane**

Plaintiff alleges in his Amd. Cplt. that the character of Roland Deschain in the Marvel graphic novels infringes the character of Restin Dane in The Rook.  Amd. Cplt. ¶38.[13]  A

---

[13] Asked in a series of interrogatories to specify as to each Dark Tower graphic novel work the elements of similarity upon which he bases his infringement claim, plaintiff' repeatedly stated his contention that the works were substantially similar was based upon the identical idea-based and

detailed summary of Roland Deschain's evolution as a character in the Marvel graphic novels is set out at Furth Decl., Ex.2, at 26-49.  It emphatically demonstrates the absence of substantial similarity between Roland and The Rook.

Because of the minimal similarities, as well as the material differences enumerated in Gale Declaration Ex. 1, at 32-33, the character of Roland Deschain in the *Dark Tower* graphic novels is not substantially similar to the character of Restin Dane in The Rook.  Roland is in most respects the antithesis of the standard comic book adventure hero.  The Roland Deschain character arc in the *Dark Tower* graphic novels is set forth in Part III of the Robin Furth expert report, Furth Decl. Ex. 1.  The Roland Deschain of the *Dark Tower* graphic novels, because he is so similar to the Roland of the prose novels, is also a very different character from Restin Dane.

Roland as depicted in the Marvel comics series is fairly consistent with the novels' depiction, covering Roland's youth to the assembling of his American destiny-mates (*ka-tet*). We see what made him hard and bitter, we see that hardness and bitterness, and we catch a glimpse of his possibility for redemption.  He is also more talkative and more humane in *The Gunslinger* graphic novel series than in the corresponding novel.  Gale Decl. Ex. 1  at 35.

Just as with the prose novel Roland, Plaintiff cannot meet the high bar to establish substantial similarity of protectible expression between Restin Dane and the graphic novel Roland Deschain.  Any similarities that exist between Roland Deschain as depicted in the Marvel graphic novels and Restin Dane in The Rook exist at a level of abstraction too basic to permit a finding that protectible expression has been appropriated.  The elements that distinguish Restin Dane from the typical adventure hero are absent from Roland.  The differences between Roland Deschain and Restin Dane are such that Plaintiff cannot meet his burden to establish that Defendants' character possesses the features that make Restin distinctive, rather than merely the broader outlines of an adventure hero.

---

character-based  formula as to each work. See Plaintiff Response to Marvel Interrogatories 2-15, Ex. 22.  None of the elements of Plaintiff's formula are distinctively delineated elements which can give rise to a character infringement.

**B.**      **There is No Evidence of Access to The Rook by the Graphic Novel Artists**

Plaintiff further alleges that certain visual elements of the Marvel *Dark Tower* graphic

novels infringe visual elements of The Rook.  Pltf. Answer to King Int. No. 12.  There is no

evidence that the creators of the Marvel *Dark Tower* graphic novels had access to Plaintiff's

work prior to creating the elements of the *Dark Tower* graphic novels.  *See* Lee Decl. ¶11;

Macchio Decl. ¶5.

**X.      *THE DARK TOWER* 2017 THEATRICAL FILM IS NOT INFRINGING**

Plaintiff alleges that the Motion Picture Defendants are liable for copyright infringement

by reason of the portrayal of the character Roland Deschain in the 2017 motion picture *The Dark

Tower*, lodged herewith as Exhibit 1 to the Jackson Declaration.

The character Roland Deschain in *The Dark Tower* film (which is a sequel to the *Dark

Tower* novels) retained some elements from the character Roland Deschain in the *Dark Tower*

novels written by Stephen King, e.g., he is a hero, he is fighting "The Man in Black,"  he is from

a society that has a caste of knight-like gunslingers, and he has fallen on hard times, his father

was victimized by The Man in Black, and he wants to do harm to The Man in Black.  But by

making *The Dark Tower* film a sequel to the prose novels, rather than a direct adaptation, the

film's screenwriters were given significant creative freedom to create a Roland Deschain who

was not a slavish copy of the Roland Deschain in the prose novels.  He dresses differently, and

his interactions with Jake Chambers, another key character in the books, are also quite different

from the way they were portrayed in Stephen King's *Dark Tower* novels.   Because Stephen

King's prose *Dark Tower* novels tell the story of a Roland Deschain who lives his life, completes

his quest, and is reborn again to restart his quest, the filmmakers were able to create a Roland

who is now reborn in a way that reflects the process of growth and change implicit in rebirth.

For example, the Roland in the prose novels loses a significant artifact called the Horn of Eld at

the Battle of Jericho.  In the books, this loss prefigures an unsuccessful end to Roland's quest.

The Roland in *The Dark Tower* film now has the Horn of Eld, which implies that Roland's

repetition of his life in this version will have differences from his last life.  Jackson Decl. Ex. 1, ¶5.

The story of the 2017 film has no substantial similarity to Plaintiff's work.  For the court's convenience, it is briefly synopsized in the Jackson Decl. ¶¶6-10.

### A.     Roland Deschain in the Theatrical Film is Not Substantially Similar to Protected Expression in Restin Dane

In his response to MRC's Int. No. 1, Plaintiff stated that his claim as to the character similarity in the motion picture is based upon the contention that:

"Roland Deschain, like Restin Dane in the allegedly infringed work, is a quasi-immortal time-traveling, monster-fighting romantic adventure hero who traverses time through dimensional doors connected to a tower, who is symbolized by a bird, who descends from a familial line of gunslingers (and an immortal) and who dresses in cowboy garb despite not being from the old west; in the aesthetical likeness of Restin Dane as well as having been similarly named consistent with an admitted signature symbolization device of Defendant King's.  In the film adaptation, Roland is depicted as an African-American, sharp-dressed gunslinger.  In this sense, the Roland as depicted in the film is a derivative of the Roland Deschain that was copied from Restin Dane.  Because Roland Deschain was an unauthorized derivative, the derivative film is a derivative of an uncopyrighted copy."

Plaintiff's Resp. to MRC Int. No. 1, Ex. 23.

Plaintiff's argument regarding purported infringement of the derivative work right embodied in 17 U.S.C. §106(2) is based upon the fallacy that every work which in some manner derived from Plaintiff's work is for that reason a "derivative work" of that work, and thus infringing.  As Nimmer explains, "[c]ountless works are 'inspired by' or 'based on' copyrighted works and in that lay sense constitute 'derivative works.'  But unless the product is substantially similar to its forbear, it remains non-actionable." *Nimmer, supra*, at §8.09[A][1].  Indeed, Nimmer points out that the derivative work right:

42232.docx

"may be thought to be completely superfluous because . . . if the latter [subsequent]

work does not incorporate sufficient of the preexisting work so as to constitute an

infringement of either the reproduction right, or the performance right, then it

likewise will not infringe the right to make derivative works because no derivative

work will have resulted."

In *Litchfield v. Spielberg*, 736 F.2d 1352, 1357 (9th Cir. 1984), the Ninth Circuit

explained the frivolousness of the theory that an infringement of the derivative right can be

found, absent a finding of substantial similarity between the two works.  The court there

reaffirmed the proposition that '[a] work will be considered a derivative work only if it would be

considered an infringing work if the material which it has derived from a prior work has been

taken without the consent of a copyright proprietor of such prior work."  *Id*., quoting *United

States v. Taxe*, 540 F.2d 961, 965 n.2 (9th Cir. 1976).

Plaintiff's interrogatory response quoted above fails to identify any substantial similarity

between the character of Roland Deschain in the 2017 film The Dark Tower and the distinctively

developed elements of The Rook character.  The Court's viewing of the 2017 film *The Dark

Tower* will confirm that Roland Deschain is not depicted as quasi-immortal, is not depicted as a

time-traveler, is not depicted as romantic, does not traverse time through dimensional doors

connected to a tower, is not symbolized by a rook bird, is not descended from an immortal, is not

depicted in the aesthetic likeness of The Rook, and does not have a substantially similar physical

appearance to Restin Dane in the allegedly infringed work.

The only cowboy elements of the film Roland Deschain's costume are his guns and gun

belt; he does not ever wear a cowboy hat.  Unlike Restin Dane, he is ignorant about technology

and is a fish out of water in a version of modern New York City.  Gale Decl., Ex. 1, p. 13.

There is simply no substantial similarity of protectible expression between Roland

Deschain as depicted in the 2017 motion picture *The Dark Tower* and Restin Dane, as depicted

in the allegedly infringed work.

**B.      There is No Evidence of Access to The Rook by the People Who Created the Character of Roland in the Film**

There is no evidence that the director, screenwriters, or anyone else responsible for the Roland Deschain character portrayal in the motion picture *The Dark Tower* had access to The Rook prior to creating the film *The Dark Tower*.  The director and screenwriters never heard of The Rook before learning of this lawsuit.  Arcel Decl. ¶7; Pinkner Decl. ¶7; Goldsman Decl. ¶7; and Jensen Decl. ¶4.

**XI.     THE GRAPHIC NOVEL AND PROSE NOVEL IMAGE DISSIMILARITIES ARE SUCH THAT PLAINTIFF'S CLAIMS OF IMAGE INFRINGEMENT WOULD BE SPECIOUS EVEN IF ACCESS WERE SHOWN**

Plaintiff alleges that the prose novels and graphic novels contained graphic <u>illustrations</u> that are substantially similar in that the illustrations share subject matter with images contained within The Rook.  Side-by-side comparisons of the alleged infringed and infringing works identified in Plaintiff's responses to King Interrogatory No. 12, and Defendants' table of the images is filed herewith as Exhibit 12.

Visual comparison of the allegedly infringing and infringed works shows that Plaintiff's image claims are predicated upon the naïve and erroneous proposition that an image copyright gives its owner a right to prohibit other images that have the same general subject matter.  It has long been the law that the underlying subject matter in visual images such as paintings is not protected by copyright law; only the specific expression of that subject matter is protected. *Franklin Mint Corp. v. National Wildlife Art Exchange*, 575 F.2d 62, 65 (3rd Cir. 1978) ("the fact that the same subject matter may be present in two paintings does not prove copying or infringement"); *Wildlife Exp. Corp. v. Carol Wright Sales, Inc*., 18 F.3d 502, 507 (7th Cir. 1994) (the idea of animal heads on duffel bags is not protectible; protection only for the specific animal heads and tails themselves); *Gentieu v. John Muller & Co*., 712 F.Supp. 740, 742 (W.D. Mo. 1989) (expressive elements in images that are protectible are the selection of background, lights, shading, and positioning); *Rogers v. Koons*, 960 F.2d 301, 307 (2d Cir. 1992) (protectible

elements of visual image involve posing of the subjects, lighting, angle, and evoking the desired expression).

The analysis that courts are required to undertake in evaluating claims of image infringement between two illustrations is exemplified by *Cabell v. Sony Pictures Entertainment Inc.*, 714 F.Supp.2d 452 (S.D.N.Y. 2010). There, the author of a novel and comic book featuring a character who divided his time between careers as a hairdresser and as a secret agent brought suit against producers of a feature film whose lead character was a former secret agent who faked his own death to pursue a career as a hairdresser. Both works featured images of the lead character brandishing a blow dryer as a weapon in an aggressive fighting pose. In rejecting the claim that the image of the character was a copyright infringement, the court first found that the concepts of a blow dryer being wielded as a weapon, and that of a fighting pose, were unprotectible ideas. *Id.* at 459-60. The court then found that defendants' images were not infringing because the characters wore different clothes, were shown in a different angle to the viewer, the images had different backgrounds, and simply could not be found to be so similar that "an average lay observer would overlook any dissimilarities between the works and . . . conclude that one was copied from the other." *Id.* at 460. As the court noted, though "comic book characters are copyrightable, protection is limited to markedly similar characters." *Id.* The same analysis here compels the identical result. The images of which Plaintiff complains have only  broad similarities such as the attractive male protagonist wielding a gun, or gazing from a height in a contemplative pose, wearing a hat, or with a crow on his shoulder. Once these unprotectible subject matter ideas are removed from the infringement calculus, the similarities vanish. Even if Plaintiff could show that the artists had access to the Rook, the claim would fail.

## XII.  PLAINTIFF'S EXPERTS DO NOT CREATE ISSUES OF MATERIAL FACT

### A.    Plaintiff's Buchanan Offers Inadmissible Lay Opinion

Plaintiff intends to offer testimony of Tracy Buchanan, summarizing his four- to five-hour effort to locate internet comments regarding similarity between The Rook and Roland

Deschain.  He found 13 random commenters, and purports to summarize their comments.  He has no idea if the commenters had actually read the works, or whether the commenters were being sarcastic, or indeed what was the true state of mind of the commenters.  Buchanan Dep. 9:1-10:21; 13:12-22 and Ex. 1 (an excerpt of the B. Buchanan Deposition is attached hereto as Exhibit 32).

The testimony of Buchanan, as well as the hearsay opinions of the random lay observers, are inadmissible.  Under Federal Rule of Evidence 701, the opinions of non-experts are admissible when they are (1) rationally based on the witness's perceptions; (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue; and (3) not based on scientific, technical or other specialized knowledge within the scope of Rule 702 (expert testimony).

Plaintiff's proffered evidence is not admissible because it fails all three of the requirements.  First, Plaintiff's thirteen random internet non-experts have not shown a foundation of personal knowledge that they have firsthand knowledge or observation of the actual works at issue.  Buchanan Dep. 9:23-10:9.  *See National Hispanic Circus, Inc. v. Rex Trucking, Inc*., 414 F.3d 546, 551 (5th Cir. 2005) (excluding lay opinion where witness lacked personal knowledge). Furthermore, the proffered non-expert opinion is not sufficiently detailed to furnish a truly rational basis for the opinion.  In order for a non-expert opinion to be admissible, the opinion or inference must be one a normal person would form based on the same perception.  *Torres v. County of Oakland*, 758 F.2d 147, 149 (6th Cir. 1985); *Asplundh Mfg. Div. v. Benton Harbor & Engineering*, 57 F.3d 1190, 1201-1202 (3rd Cir. 1995).

Non-expert opinion on the issue of copyright substantial similarity also fails the second element of F.R.Evid. 701, because such lay opinions are not helpful to determining a fact in issue.  Lay opinions are not helpful when the properly instructed trier of fact can draw the necessary inferences and conclusions from the facts presented without the aid of the non-expert opinion.  *See Hester v. BIC Corp*., 225 F.3d 178, 181 (2d Cir. 2000) (excluding non-expert opinion when conduct at issue had been adequately described by witnesses).  Lay opinion

testimony is especially unhelpful when it embraces the ultimate issues in the case, since the benefits of such testimony "diminish the closer the opinion approaches the crucial issues in the case." *Hester, supra*, 225 F.3d at 182. *Hirst v. Inverness Hotel Corp.*, 544 F.3d 221, 226-227 (3rd Cir. 2008) (lay opinion of ultimate issue not helpful because jury's opinion is as good as the witness's, and the witness turns into little more than an "oath helper.").

Plaintiff's proffered non-expert opinion on the issue of similarity fails the third element of F.R.Evid. 701, in that Plaintiff is using non-expert opinion to smuggle in an opinion that must be based upon specialized knowledge, and meet the higher standards of F.R.Evid. 702. Lay witnesses are generally precluded from testifying as to "matter which are beyond the realm of common experience and require the special skill and knowledge of an expert witness." *Certain Underwriters at Lloyds, London v. Sinkovich*, 232 F.3d 200, 204-205 (4th Cir. 2000). The third element of F.R.Evid. 701 exists in order to prevent parties from offering "an expert in lay witness clothing" and thereby evading the reliability requirements of F.R.Evid.702, and F.R.Civ.P. 26's expert witness disclosure requirements. *See* F.R.Evid. 701, Adv. Comm. Note (2000). In *Warner Brothers, Inc., v. American Broadcasting Cos.*, 720 F.2d 231 (2d Cir. 1983), plaintiff claimed that defendant's television series Greatest American Hero infringed its copyright in the Superman character. Plaintiff conducted a survey of the public that it offered into evidence in order to establish substantial similarity. Rejecting the admissibility of the survey, the court noted:

> "The 'substantial similarity' that supports an inference of copying sufficient to establish infringement . . . is not a concept familiar to the public at large. It is a term to be used in the courtroom to strike a delicate balance between the protection to which authors are entitled under an act of Congress and the freedom that exists for all others to create their works outside the area protected against infringement . . . [W]here trial judges correctly ruled that two works are not substantially similar as a matter of law, that conclusion is not altered by the availability of survey evidence indicating that some people applying some standard of their own were reminded by

34

one work of another.

*Id.* at 245.  *See Aaron Basha Corp. v. Felix B. Vollman, Inc.*, 88 F.Supp.2d 226, 231-32

(S.D.N.Y. 2000) (rejecting survey evidence as to substantial similarity).  In *Steele v. Turner*

*Broadcasting System, Inc.*, 646 F. Supp. 2d 185 (D. Mass. 2009), a music infringement case,

plaintiff opposed defendant's motions for summary judgment by offering into evidence a series

of declarations from assorted "ordinary listeners."  The court rejected the affidavits as

inadmissible lay opinion because there was no evidence that the ordinary listeners were

"correctly applying the pertinent legal standards, nor was there any reason to believe that the lay

opinion would be "helpful" to the fact finder.  *Id.* at 191.  All of Plaintiff's proffered non-expert

opinion on the similarity issue is inadmissible.

Lay opinion testimony regarding similarity is useless in cases such as this because, here,

the determination of substantial similarity by lay witnesses fails to consider (1) any portion of the

work that is the result of a prior common source, *e.g.*, the spaghetti western Clint Eastwood, (2)

any portion of the work that is in the public domain, a cliché, or scenes-a-faire, *e.g.*, the brave

hero gunslinger in western garb and (3) any idea expressed or described in Plaintiff's work, *e.g.*,

cowboy garb worn by a time traveler.  *See* 11th Circuit Civil Jury Instructions §9.10 (2013

Rev.)(Special Interrogatories instruct jury to ignore such matter).

**B.**    **Plaintiff's Typewriter Expert Pridgen Offers No Relevant Testimony**

On May 15, 2018, Denice Kelly gave a deposition, testifying that in 1975 she typed pages

2-135 and 152-167 of a draft of the first novel in the Dark Tower series, The Gunslinger.  Her

testimony is corroborated by Stephen King diary entries, and by a postmarked letter from King to

her dated September 23, 1975 sending her payment for her typing services.  Plaintiff has

designated typewriter repairman Bill Pridgen as an expert, who signed an expert report prepared

by someone else (he doesn't know who) dated May 22, 2018.  Pridgen Dep. 6:21-7:1; 21:10-21,

Ex. 1 filed herewith (an excerpt of the B. Pridgen Deposition is attached hereto as Exhibit 33).

Kelly had testified that she typed her pages on various IBM Selectric typewriters situated in the

typing room at the Boulder, Colorado secretarial school she attended.  Kelly Dep. 16:4-18:17;

25:1-26:12; 75:16-76:5 (an excerpt of the D. Kelly Deposition is attached hereto as Exhibit 34).

Pridgen testified that, based upon his review, if he were told that pages 2-136 and pages 152-166

were typed in 1975 by a typist who typed the work at different times during 1975, nothing in his

review of those pages would tend to contradict it.  His opinion is that all those pages were typed

on an IBM Selectric typewriter using the Prestige Elite element with a 12-pitch size, though

some pages might have been typed with different ribbons.  Pridgen Depo. 85:9-86:12.  Kelly's

testimony is consistent with Pridgen's.  *Id*.  Kelly Decl. ¶¶4-8.

Pridgen signed a supplemental report, Pridgen Dep. Ex. 2, dated August 7, 2018 in which

he stated that pages 137 to 151 of the 1975 Fogler Library manuscript were typed with an IBM

Selectric typewriter containing a Courier 10 typing element, and that the typewriter used to type

pages 137-151 had the same defective cable as certain 1980 correspondence of Stephen King's.

*Id*.  The inference to be drawn from this statement was that the pages 137 to 151 were typed in

1980.  At his deposition, Pridgen expressly stated that this part of his supplemental report was

incorrect, and that he no longer claimed that pages 137 to 151 were typed with a typewriter with

a defective cable that typed the 1980 correspondence.  Pridgen Dep. 50:21-51:24; 53:3-19.

Nothing that Pridgen testified to regarding pages 137 to 151 casts doubt in any way upon the

testimony of Stephen King that he typed those pages prior to 1977.

**C.**     **Plaintiff's Similarity Expert Arndt Has Highlighted The Absence of Any Relevant Similarity Between Plaintiff's and Defendants' Works**

More than 18 months after this case was filed, Plaintiff's similarity expert,[14] Richard

---

[14] Plaintiff's counsel has stated that, despite the witness's withdrawal, he still plans to use the expert similarity opinion of Plaintiff's former expert Jeff Rovin.  Rovin signed a document not under penalty of perjury that was called a declaration and filed in this action, Dkt. 20-3.  At his deposition, Rovin characterized that document as a "placeholder," Rovin Dep. 126:5-127:1, and the result of an "incomplete investigation" in that he had not done a thorough look at the "contra" side.  *Id*. 93:8-13 (an excerpt of the J. Rovin Deposition is attached hereto as Exhibit 36).  He testified that his "declaration" was not intended to be produced in the action.  *Id*. 92:12-93:24.  Rovin admitted that the only familiarity with Defendants' works at the time that he signed the "declaration" was that he had read the second, third and fourth installments of the original *Gunslinger* novella, and had seen a trailer for the theatrical motion picture.  Rovin Dep. 23:6-25.  By the time he was deposed, he had seen the theatrical motion picture, but he had no

Arndt, prepared a report detailing the similarities that he claimed to exist between Stephen

King's Roland and Plaintiff's Rook.  It is filed herewith as Exhibit 13.  Arndt identified seven

similarities.  Remarkably, two of the aspects of the works that Arndt found to be similar—(1)

"that both works are based to some extent on Clint Eastwood's "Man With No Name" character

from spaghetti westerns such as *The Good, The Bad, and The Ugly*, and (2) both works relied

upon the lines from Shakespeare's *King Lear* that are a part of the Robert Browning poem,

which provided such elements as the name Roland, the use of a dark tower, and the presence of a

portentous black bird—demonstrate that central components of Plaintiff's claim are not original

to Plaintiff and not protected by copyright because they are based upon material either in the

public domain or traceable to common sources.  *See Infodek, Inc. v. Meredith-Webb Printing

Co.*, 840 F.Supp. 614, 624 (N.D. Ga. 1993); *Selle v. Gibb*, 741 F.2d 896 (7th Cir. 1984) ("two

works may be identical in every detail, but if the alleged infringer created the accused work

independently or both works were copied from a common source in the public domain, then

there is no infringement").

The remaining five similarities identified by Plaintiff's expert are equally unavailing.

First, Arndt claims that the names of the two lead characters are similar.  Defendants dispute the

notion that the names are similar, but because names do not contain expression, copyright law

does not protect them.  *Peters v. West*, 776 F.Supp.2d 742 (N.D. Ill. 2011) (name "Kate Moss"

not protectible); *Fisher v. United Feature Syndicate, Inc.*, 37 F.Supp.2d 1213, 1226 (D. Col.

1999) (name "Chipper" not protectible); 37 CFR §202.1(a).  Indeed, Plaintiff's expert Arndt

acknowledges that the name "Roland" did not derive from Plaintiff's work; it came from the

Robert Browning poem.  Arndt Dep. 29:21-30:4 (an excerpt of the R. Arndt Deposition is

attached hereto as Exhibit 35).

The second similarity cited by Arndt is that both Roland and Rook appear to the casual

---

opinion concerning its similarity (or not!) to Plaintiff's work.  *Id*. at 155:4-16.  Without having
read any of the Defendants' works in their entirety, and without conducting a thorough analysis,
Rovin has no foundation of personal knowledge upon which to base an admissible expert
opinion.  See F.R.Evid. 702(a), (b), and (d).

observer to be western characters although neither is.  This is not a similarity; it is a difference.
Roland wears clothes appropriate to his time and place in Mid-World.  Id. 126:17-19.  Rook lives
in the 1970s and wears clothes associated with the Old West.  *Id*. at 31:8-14.

Arndt's third purported similarity is that both Roland and Rook apparently use a single-
action Colt .45 as a sidearm.  As Arndt admitted as his deposition, Rook uses multiple different
side arms, and there is no instance identifiable in the text of any of the Dark Tower works to
indicate that Roland uses a Colt .45.  Indeed, Arndt acknowledged that Roland's gun had been
handed down to him for generations, and had been forged from metal contained in Mid-World's
equivalent of the sword Excalibur.  *Id*. at 36:14-20.

Arndt's fourth claimed similarity is that "both use a crow or raven as an ally in their early
tales."  At his deposition, Arndt recanted, and acknowledged that Roland did not use a crow or
raven as an ally.  *Id*. 71:9-72:5.  All that Arndt could do was point to the cover of Dark Tower
books showing a crow next to Roland.  *Id*. at 99:3-23.

The final purported similarities identified by Arndt are that "both have similar young
assistants who eventually join them on their epic quests," and "both romance similarly employed
women in their early appearances."  At his deposition, Arndt was unable to identify any young
assistant who assisted Rook.  *Id*. at 79:9-80:1.  As for the "romance," Roland and the saloon
owner "Allie" briefly become lovers before he shoots her to death, and there is nothing
comparable in Rook's interactions with women.  *Id*. 90:4-91:18.

More to the point, Arndt's listing of similarities cannot create a genuine issue of material
fact because Arndt has not attempted to separate similarity of ideas from similarity in expression
of those ideas.  *Id*. at 28:6-12.  *See Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996).
Arndt's analysis is legally defective because it ignores the fact that the ordinary observer test
does not require that we ignore dissimilarities.  Where ". . . the dissimilarities between two works
exceed the similarities and the similar elements 'are—when compared to the original work—of
small import quantitatively or qualitatively,' a finding of no infringement is appropriate."
*Sheldon Abend Revocable Trust v. Spielberg*, 786 F.Supp.2d 200, 205 (S.D.N.Y. 2010), quoting

38

*Rogers v. Koons*, 960 F.2d 301, 308 (2d Cir. 1992).  At deposition, Arndt conceded that unlike

Rook, Roland has a complex interior life, and perceives that the entire purpose of his life is

bound up in reaching the Dark Tower.  The Rook does not have comparable complexity, or a

comparable purpose.  Arndt Dep. 91:25-92:7.  Unlike Roland, Rook does not engage in

introspection.  *Id.*, 93:8-21.  Unlike Roland, Rook during the course of his career ages perhaps

ten years, whereas Roland lives for hundreds of years.  *Id.* 93:23-95:10.

Arndt conceded that Roland is a much grimmer character than Rook.  *Id.* 105:19-106:1.

The Rook lives in Rook Manor; Roland has no home, and is a nomad.  *Id.* 106:13-20.  Roland

lives in Mid-World, whereas the Rook lives in 1970s Arizona. *Id.* 106:21-107:1.  Roland has an

extensive character arc; Rook does not have a comparable character arc.  *Id.* 110:16-111:3.

Roland's associates (a heroin addict, a paraplegic black woman, and a 12-year-old boy) are

significantly different than Restin's crew of his great-great-grandfather and his robot Manners.

*Id.* 108:10-109:4.  Roland speaks in a stilted dialect; Rook does not.  *Id.* 108:1-9.  Roland robs a

gun store; Restin does not rob or steal from anyone.  *Id.* 112:13-19.  Roland engages in ruthless

conduct that includes the use of a pistol to sexually assault a woman, and the killing of all of the

inhabitants of the town of Tull.  Rook does not have that degree of ruthlessness.  *Id.* 109:5-16.

Whereas Roland has one constant nemesis, Rook has a variety of unaffiliated enemies.  *Id.*

113:11-114:10.

Indeed, Arndt conceded that, as the Dark Tower series of books proceeds, it diverges

farther and farther from similarities that Arndt saw.  *Id.* 109:17-110:15; 112:24-113:10; 113:11-

114:10.  Whereas Roland's quest for the Dark Tower has narrative continuity, there is no

continuity in Rook's quest.  *Id.* 129:2-130:15.  Whereas Roland's interdimensional travel takes

him to times other than his own, he does not have the ability to travel to other times in his own

world, unlike Rook.  *Id.* 140:23-141:16.  Roland travels through a dimension of a parallel

universe, whereas Rook travels through a dimension of time. *Id.* 156:5-157:23

Finally, Mr. Arndt agreed with Defendants' expert that many of Plaintiff's claimed

similarities are either not significant, not consequential, or are trivial.  Specifically, being a crack

shot, *Id*. 141:23-142:16, being skilled in hand-to-hand combat, *Id*. 142:20-143:9, having

numerous romantic liaisons, *Id*. 144:1-11, being adventurers, *Id*. 145:7-12, being the main

protagonist, *Id*. 147:12-14, having a strong sense of bravery, *Id*. 147:15-148:11, being a born

leader, *Id*. 149:19-24, being determined, *Id*. 149:25-150:7, and not being patient, *Id*. 155:5-13.

Arndt's opinions reinforce the proposition that no properly instructed jury could find Roland and

Rook to be substantially similar in protected expression.

## CONCLUSION

Stephen King independently created the Roland character prior to 1977, and Roland, in

all of his textual and visual iterations, is not substantially similar to any protectible expression in

The Rook.  Plaintiff's claim is founded upon a misconception of the scope of copyright

protection and attempts to ignore both the relevant prior art and Roland's prior independent

creation.  Plaintiff cannot meet his burdens of proof to show copying, and to show substantial

similarity of protectible expression.  Defendants are entitled to judgment.

DATED:  November 7, 2018                    Respectfully submitted,


                                            /s/   Vincent Cox
                                            Scott D. Ponce (FBN 0169528)
                                            Sanford L. Bohrer (FBN 160643)
                                            HOLLAND & KNIGHT LLP
                                            701 Brickell Avenue, Suite 3000
                                            Miami, Florida 33131
                                            Telephone: (305) 789-7678
                                            Facsimile:  (305) 665-2843

                                            and

                                            Louis P. Petrich, *Pro Hac Vice*
                                            Vincent Cox, *Pro Hac Vice*
                                            Leopold, Petrich and Smith, P.C.
                                            2049 Century Park East, Suite 3110
                                            Los Angeles, California 90067-3274
                                            Telephone: 310/277-3333
                                            Facsimile: 310/277-7444
                                            Email: lpetrich@lpsla.com
                                                       vcox@lpsla.com

                                            Attorneys for Defendants